**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**(ATLANTA DIVISION)**

**CASE NO.**

JAMES EASON, EASON HERITAGE LLC,
CHRISTOPHER EASON, HEATHER
EASON, HEATHER ELIZABETH
DESIGNS, LLC d/b/a Z&CO DESIGN             **COMPLAINT-CLASS ACTION**
GROUP, and PARAGON DESIGNER
SERVICES, LLC,

      Plaintiffs,

vs.


TRUIST BANK,

      Defendant.

_____/

**CLASS ACTION COMPLAINT**

      Plaintiffs, James Eason, Eason Heritage LLC, Christopher Eason, Heather Eason, Heather Elizabeth Designs, LLC d/b/a Z&Co Design Group and Paragon Designer Services, LLC (collectively, "Plaintiffs" or "Class Plaintiffs"), bring this Complaint individually and on behalf of all others similarly situated, against Truist Bank ("Truist"), and allege as follows:

**INTRODUCTION**

      1.     This is an action against Truist for aiding and abetting a massive Ponzi scheme orchestrated by Russell Todd Burkhalter ("Burkhalter") through his company Drive Planning LLC ("Drive Planning"). Using uniform marketing materials and investor agreements, Burkhalter and Drive Planning misrepresented to investors that they would use investor funds to make bridge loans to and/or enter into joint ventures with property developers. Burkhalter and Drive Planning

guaranteed investors that they would receive high returns every three months and that the investments were secured by real property.

2.      In reality, Burkhalter and Drive Planning used accounts at Truist to operate a classic Ponzi scheme.  They paid returns to investors using new investor money, raising more than $300 million from more than 2,000 investors before the Securities and Exchange Commission ("SEC") filed an action and obtained temporary restraining orders freezing the assets of Burkhalter, Drive Planning and others.  On August 13, 2024, the district court appointed Kenneth Murena as receiver for Drive Planning (the "Receiver"). *See SEC v. Drive Planning, LLC, et al.*, No. 0:21-cv-61644-AHS (N.D. Ga.) (Calvert, J.).

3.      For years, Burkhalter and Drive Planning used accounts at Truist to misappropriate funds from investors and make Ponzi payments.  Burkhalter had complete dominion and control over Drive Planning, and its finances and accounts at Truist served as his primary vehicle to misappropriate investor funds and recharacterize investment funds into purported profits.  Indeed, Truist hosted the accounts and executed the deceptive transactions that allowed Burkhalter to run the Ponzi scheme and dissipate investors' funds.

4.      Truist knew of and participated in Burkhalter's scheme.  From a bank's perspective, the fraudulent scheme was obvious.  A fraudulent scheme of this magnitude cannot be run surreptitiously through a bank.  And here, it did not.

5.      Indeed, upon information and belief given the amount of funds and volume of transactions, Truist employees, acting within the scope of their duties at Truist, were intimately and actively involved with the activity in Drive Planning's accounts.

6.      Truist's knowledge of the scheme is further bolstered by its "Know Your Customer" inquiries into the accounts and its AML/fraud monitoring duties.  From the time of

opening Drive Planning's accounts, Truist knew that Drive Planning was supposed to use investor funds to make bridge loans to property developers and/or enter into joint ventures with property developers to generate money to repay investors. Truist also knew that the accounts held investor funds.

7. Truist, with sophisticated software and processes to detect unlawful transactions, observed firsthand Burkhalter's misuse of investor funds. Truist looked for such fraudulent activity because, as a regulated financial institution, it had to.

8. Truist saw that very little money—if any—going into the accounts came from profits from property developers. Instead, Truist saw a great deal of investor money entering the accounts and an array of banking activities blatantly at odds with the claimed business model. Indeed, Truist saw a massive influx of funds from investors, but no real income from property developers. The SEC examined the Drive Planning's bank account records (the same records available to Truist) and concluded that the transactional activity in the accounts was not consistent with its purported business model.

9. Truist knew from the account activity that Drive Planning was not using funds for loans and/or joint ventures with property developers, and it knew that the accounts were not receiving payments from property developers, let alone payments that came close to matching Drive Planning's committed outlays and purported business operations.

10. The account activity was rife with wire fraud and money laundering, which typically generate insufficient funds notices and trigger other alerts. Additionally, despite the lack of profits, Truist saw new investor funds being used to pay false returns to other investors.

11. Also, Truist provided a business loan to Drive Planning. As part of the underwriting of that loan, Truist obtained further financial information from Drive Planning

evidencing that Drive Planning's main source of income was investor funds.  Yet Truist knowingly allowed Drive Planning to make loan payments from the account holding the money of Drive Planning's investors.

12.     The pattern of misuse of investor funds was self-evident.  Despite this knowledge, Truist participated in the fraud and substantially assisted Burkhalter by allowing and actively enabling him to continue operating with Truist accounts, misappropriate investor funds, and make the transfers necessary to perpetrate the scheme.

13.     With its goal to maximize assets held, account and transfer-related revenue and compensation, Truist and its employees actively accommodated Drive Planning's pattern of misuse and misappropriation and went well beyond providing ordinary banking services.

**PARTIES**

**1.**     **Plaintiffs**

14.     James Eason is a citizen of the state of Georgia who resides in Cumming, Georgia.

15.     Eason Heritage LLC is a Delaware limited liability company with its principal place of business in Cumming, Georgia.  Its sole member is James Eason.

16.     Christopher Eason is a citizen of the state of Georgia who resides in Cumming, Georgia.

17.     Heather Eason is a citizen of the state of Georgia who resides in Cumming, Georgia.

18.     Heather Elizabeth Designs, LLC d/b/a Z&Co Design Group is a Georgia limited liability company with its principal place of business in Cumming, Georgia.

19.     Paragon Designer Services, LLC is a Georgia limited liability company with its principal place of business in Alpharetta, Georgia.

**2.**     **Defendant**

20.     Defendant, Truist Bank, is a state-chartered bank formed in North Carolina, with its principal place of business in Charlotte, North Carolina.  Truist conducts its business nationwide, including in Georgia.  Truist provided banking services to Drive Planning in Georgia.

**3.**     **Relevant Non-Parties**

21.     Drive Planning is a Georgia limited liability company formed by Burkhalter in 2015.  Its principal place of business was in Alpharetta, Georgia.

22.     Burkhalter is a resident of St. Petersburg Florida.  He is the sole owner of Drive Planning and controlled Drive Planning at all relevant times.

**JURISDICTION & VENUE**

23.     **Subject Matter Jurisdiction**. The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, Title 28, United States Code, Section 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Class who are citizens of different states than Defendant Truist; and (iii) there are in the aggregate more than 100 members of the proposed class.

24.     **Personal Jurisdiction**. This Court has specific personal jurisdiction over Truist pursuant to Rule 4(k)(1)(a) and Georgia Code Section 9-10-91 because the causes of action alleged arise from Truist's tortious acts or omissions within Georgia, its transacting in business in Georgia, and its causing injury to persons or property within Georgia while engaged in and/or soliciting business in Georgia.

25.     Truist regularly and systematically operates, conducts, engages in and carries on a business or business venture in Georgia.

26.     This Court also has long-arm personal jurisdiction over Truist.  Truist is engaged in substantial and not isolated activity within this state, operating more than 270 bank branches in 106 cities throughout Georgia.

27.     **Venue**. Venue is proper in this forum pursuant to Title 28, United States Code, Section 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District, and because Defendant would be subject to personal jurisdiction with respect to this action in this District if this District were a separate state.

## ADDITIONAL FACTUAL BACKGROUND

### 1.     The Fraudulent Scheme

28.     From at least 2020 and continuing through August 2024, Burkhalter and Drive Planning raised over $300 million from more than 2,000 investors across the United States, including Georgia, through a fraudulent investment scheme.

29.     To raise money from their victims, Burkhalter and Drive Planning falsely represented to investors and prospective investors that their money would be used to fund bridge loans to property developers, which Burkhalter called Real Estate Acceleration Loans ("REAL"), or through joint ventures with property developers.  In exchange, Burkhalter and Drive Planning promised victims they would receive high returns of 10% every three months.

30.     Burkhalter and Drive Planning solicited and raised money from investors by various means, including brochures, online videos, in-person presentations, social media posts, and web pages. These advertisements were distributed to the general public through means such as U.S. Mail, email, YouTube, Facebook, and the company's website.  Burkhalter and Drive Planning also increased the inflow of cash from REAL investors by recruiting and paying sales

agents, who were paid a four percent commission on each REAL investment sold, including on amounts that investors chose to "rollover" into a new 90-day investment.

31.     Drive Planning's marketing message was uniform: that Drive Planning would use the investor's money to fund real estate bridge loans and/or enter into joint ventures with property developers.  The property developers' repayments would be used to repay the investor the promised return of 10% in three months.  Burkhalter and Drive Planning also told investors that the REAL investments were fully collateralized by real estate.  In fact, REAL investors held no security interest in any real estate. Their investments were wholly unsecured.

32.     Drive Planning entered into standardized, uniform agreements with each victim (the "Investor Agreement").  The Investor Agreement for the REAL investments referred to the investor as the "Lender," and guaranteed a high 10% return with the option to roll over the investment for additional three-month periods.  The Investor Agreement also provided that the loans were secured by real property.

33.     Burkhalter and Drive Planning knew at the time they made the representations to investors that they were false.  According to the SEC, and unbeknownst to investors, Drive Planning did not have "any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months."

34.     Contrary to what it represented to investors, Burkhalter and Drive Planning failed to use investor funds to make bridge loans to property developers or for joint ventures with developers. Instead, in classic Ponzi-scheme fashion, Burkhalter and Drive Planning steered investor funds to pay returns to other investors, misspent investor funds on sales agent commissions, and misappropriated investor funds to finance Burkhalter's extravagant lifestyle, including purchasing a multimillion-dollar yacht, luxury cars, and private jets.

35.     Burkhalter and Drive Planning did not disclose that funds invested would or could be used to pay back principal or interest to earlier investors, or that any "return" could be funded by principal invested by later investors rather than by profits from real estate deals.  They also did not disclose that investments would or could be used to fund the personal expenses of Burkhalter.

36.     Drive Planning furthered the scam by prompting investors to rollover their REAL investments, including the supposed 10 percent return, at the end of the three-month term. Unbeknownst to investors, any withdrawal would necessarily be sourced by the principal invested by a later REAL investor, not a profitable use of the investors' funds.

37.     Further, contrary to the representations to victims, the investments in REAL were not secure.  The only way Drive Planning could honor its obligations to investors would be through the successful continuation of the fraudulent scheme.  Once the supply of new victims was exhausted, Drive Planning would be unable to pay the promised returns to existing investors.

38.     According to the SEC, the available bank records show that Burkhalter and Drive Planning raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024.  However, instead of paying investors out of the revenue of the business, they used new investor money to pay returns to existing investors — a classic Ponzi scheme.

39.     As a result of Burkhalter and Drive Planning's uniform misrepresentations, Plaintiffs and investors reasonably believed their investments were used to fund REAL and were relatively safe.  Had they known about the misrepresentations and omissions, they would not have invested and/or would not have rolled over their investments.

**2.     Burkhalter and Drive Planning Had Fiduciary Duties to Plaintiffs
and the Other Investors**

40.     Burkhalter and Drive Planning had a duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship.  Specifically, Burkhalter and

Drive Planning had a duty to take Plaintiffs' and class members' money and use it fund bridge loans to property developers and/or enter into joint ventures with property developers, to collect repayments from those property developers, and to deliver the money to Plaintiffs and class members according to a set payment schedule.

41.     In addition, Burkhalter and Drive Planning fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

42.     Burkhalter and Drive Planning knew that investors, including Class Plaintiffs and class members, were relying on and trusting them to properly invest their hard-earned money.  The investors relied on and trusted Burkhalter and Drive Planning, and Burkhalter and Drive Planning knew of and encouraged that reliance and trust.

**3.     Truist Knowingly Participated in the Fraudulent Scheme**

43.     From the start, Burkhalter and Drive Planning used Truist as the primary bank to operate the Ponzi scheme.  Indeed, the very first REAL investor funds deposited in the Truist accounts were immediately misused.

44.     Burkhalter and Drive Planning used accounts at Truist as the primary vehicle to receive investor funds, misappropriate their funds, and use the investors' funds to pay false returns. Truist hosted the accounts and executed the deceptive transactions that allowed Burkhalter and Drive Planning to run the fraudulent scheme and dissipate the investors' funds.

45.     Burkhalter had dominion over Drive Planning and its finances.  Drive Planning held three bank accounts at Truist and conducted thousands of banking transactions through Truist. Burkhalter was the sole signatory on all three of the Truist accounts, until May 15, 2023, when his wife and one other individual were added as signatories to one of the Truist accounts.

46.    For years, Truist enabled Burkhalter and Drive Planning to use accounts at Truist to take in the investors' funds and divert them from their intended purpose.

47.    Truist knew that Drive Planning's account activity was inconsistent with Truist's Know Your Customer and due diligence information.  Federal law requires banks to "know their customers" and understand their customers' banking behavior.  Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2).  Thus, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

48.    Customer due diligence requires Truist to identify its customers, report indications of suspicious activity and assign a "customer risk rating."  Customer due diligence requires Truist to know what business the customer is in, and to understand the types of transactions a customer should, and actually does, make. When monitoring its customers' accounts, Truist is obligated to comply with the Bank Secrecy Act (BSA), including regulations broadening its anti-money laundering provisions. The BSA requires Truist to develop, administer and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

49.    Truist must also maintain a customer due diligence program to predict the types of transactions, dollar volume and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each

customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

50.    Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining the (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

51.    Truist and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual. These include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round-dollar amounts; (7) payments unconnected to legitimate contracts or revenue sources; (8) fund transfers containing limited content or related party information; and (9) an unusually large number of persons or entities receiving fund transfers from one company.

52.    Here, Truist engaged in a Know Your Customer analysis of Drive Planning and monitored its accounts for anomalous or suspicious behavior.  Truist collected and reviewed information about Drive Planning's business operations, the source of its funds and the purpose of its accounts.

53.     On May 13, 2020, Drive Planning opened a business loan account with Truist.  In connection with obtaining that loan account, Truist conducted additional due diligence on Drive Planning.

54.     Truist understood Drive Planning's claimed business model: to raise money from investors and use it to fund REAL.  Truist, therefore, should have seen banking activity consistent with this business model.  That is, Drive Planning's banking activity should have reflected its receipt of investor funds, use of those funds to make loans to property developers, receipt of repayments and interest payments from property developers, and use of those funds to pay returns to investors.  But that was not what Truist saw.  Instead, it saw a great deal of investor money entering the Drive Planning accounts—and an array of banking activities blatantly at odds with Drive Planning's claimed business model.

55.     Importantly, Truist knew that Drive Planning's accounts received *investor* funds. Indeed, according to the SEC's forensic accountant, Drive Planning deposited tens of millions of dollars from thousands of separate payors into the Truist accounts.  Upon information and belief, many of those deposits featured transaction memos that specifically notified Truist of the purpose of the payment as "investment," "REAL investment," or similar terminology.  For example, the SEC's forensic accountant states that "on June 14, 2024, [Drive] received a $65,000 wire ***with a memo indicating it was for a REAL investment from a previous investor in the program***." (emphasis added).  Indeed, Drive Planning's wire instructions direct investors to put "Your Name/REAL" in the comments.

56.     Additionally, the deposits from investors and withdrawals out of the accounts were mostly round numbers, drawn on accounts of many different individuals and entities, which were followed by similar, round-number payments to those individuals or for non-REAL purposes.

57.     As a further example of banking activity that conflicted with Drive Planning's business model, one would expect to see a regular flow of repayments from property developers/borrowers reflected in Drive Planning's bank accounts.

58.     The SEC examined Drive Planning's bank account records (the same records available to Truist) and concluded that the transactional activity in the accounts was not consistent with its purported business model.  In fact, the SEC's forensic accountant does not identify any income from loans to, or joint ventures with, property developers.  Rather, Drive Planning's revenue sources were limited to commissions earned on life insurance sales, membership fees (ranging from $2,000 to $5,000) from clients who received financial planning services, and rental income from a few properties.

59.     Truist knew from the account activity that Drive Planning was not using funds for loans and/or joint ventures with property developers, and it knew that the accounts were not receiving payments from property developers, let alone payments that came close to matching Drive Planning's committed outlays and purported business operations.

60.     According to the SEC, the flow of funds in Drive Planning's bank accounts shows that the funds used to pay investors their principal and interest were derived primarily from other investors' deposits.  According to the SEC, from September 1, 2020, to June 2024, Drive Planning's main accounts received deposits of $389.6 million.  Of these deposits, at least $372 million (95.4%) were received from investors in the REAL program. During this same period, Drive Planning only received funds totaling $17.6 million from other sources, with $4,056,707 million of that from investors in other investment programs Drive Planning was running, $1,668,534 from business loans to Drive Planning, $1,201,525 from Cryptocurrency, $942,712 from bank interest, $536,974 from the sale of an RV, $489,933 from Drive Planning's COO,

$421,126 from insurance commissions, $53,970 from related businesses, and $8,271,145 from unknown sources.

61.     The SEC concluded that Drive Planning used at least $154,918,462 to pay investors what appear to be returns and principal payments.  With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available (none of which is identified as coming from repayments from property developers), approximately $137.2 million of the "returns" must have been sourced from investor funds.  Thus, it was apparent that, instead of using the funds to provide loans to property developers as promised, Burkhalter and Drive Planning used the majority of investor funds in the Truist accounts to make interest and principal payments to other investors in classic Ponzi fashion.

62.     In addition to using investor funds to make Ponzi payments, from the very beginning of the REAL program, Drive Planning used investor funds in the Truist accounts for personal expenses and luxuries and expenses unrelated to REAL.

63.     Investments in REAL were and are "securities" as defined by federal securities law. Investors looked solely to Burkhalter and Drive Planning to produce returns, and Burkhalter and Drive Planning's ability to do so depended entirely on their ability to either fund a profitable REAL program or attract new investors to cover payments to existing investors. The bank knew or willfully ignored that Drive Planning was raising considerable investor funds from thousands of investors, but was not properly registered to sell securities or qualify for any exemption for the sale of securities.

64.     Despite this knowledge of fraud, Truist failed to timely act upon the accounts connected with Drive Planning. Truist continued to accept deposits of investor money and carry out the transfers needed to consummate the fraud.

65.     Truist's actions and inaction were integral to the scheme to defraud investors.  It was through Truist account transactions that Burkhalter and Drive Planning applied new investor funds to pay existing investor returns, misspent investor funds on sales agent commissions and personal luxuries.

66.     Burkhalter and Drive Planning could not have carried out the scheme without first raising a large amount of funds from investors and then depositing and transferring those funds among bank accounts.  Drive Planning's use of Truist accounts enabled them to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments with interest earned from bona fide bridge loans.

67.     Had Truist not knowingly participated in the scheme from its inception, and/or had closed Drive Planning's accounts at Truist early on, none of the Plaintiffs or other class members would have suffered damages.

68.     Truist benefitted from Drive Planning's continued use of its accounts, which generated significant fees and the use of millions of dollars in deposits.

**4.      Truist Knew About the Fiduciary Duty Owed to the Investor Victims**

69.     Truist knew that Burkhalter and Drive Planning owed fiduciary duties to victims.

70.     Truist, through monitoring and through the bank's Know Your Customer inquiries, knew that Burkhalter and Drive Planning had a duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship.  Burkhalter and Drive Planning had a duty to take Plaintiffs' and class members' money and use it to fund bridge loans to property developers, collect repayments from those borrowers, and deliver the money to Plaintiffs and class members in accordance with the Investor Agreements.

71.     Truist also knew that investors were relying on and trusting Burkhalter and Drive Planning to properly invest their money.

**5.      Victims Included Class Plaintiffs**

**A.      James Eason and Eason Heritage LLC**

72.     Class Plaintiff Jim Eason is 65 years old and has worked for Siemens for the last 39 years.  For the last 27 years, Jim Eason has managed Siemens' commercial real estate holdings.

73.     In April 2022, Burkhalter introduced Jim Eason to Drive Planning's COO, David Bradford ("Bradford"), who had a preexisting relationship with Jim's son, Chris Eason.

74.     Between April 26, 2022, and May 19, 2022, Jim Eason and Bradford participated in multiple calls and a meeting.  During those calls and at the meeting, Bradford introduced Jim Eason to Drive Planning's Real Estate Acceleration Loan ("REAL") investment opportunity, as well as a similar real estate investment opportunity that Drive Planning called "CORE."

75.     Bradford told Jim Eason that the REAL program was a profit-sharing deal in which Drive Planning would provide capital for a developer to develop land.  The developer would then split the profit from sale after development, and returns would be distributed to investors.  CORE was a similar real estate opportunity that purported to turn a profit by purchasing tax liens on real estate.

76.     Bradford falsely told Jim Eason that the return on the REAL investments was 10% of the principal every 90 days, and that there was an option to roll over the principal.  The CORE investments were also offered through promissory notes with a three-year maturity period promising 22% annual interest.

77.     Bradford gave Jim Eason marketing materials making these representations.

78.     Reasonably relying on Drive Planning's representations that REAL and CORE were legitimate investments, and given Bradford's omission that Drive Planning was a Ponzi Scheme, Jim Eason invested a total of $2,538,633 via 13 promissory notes.  For each investment, Drive Planning required Jim Eason to wire his funds to Drive Planning's Truist Bank account and include in the wire instructions the following notation, "Investment-James Carl Eason."

79.     Below is the list of the fraudulent investments:

| REAL/CORE Notes | Date | Principal Investment | Method of Payment |
|---|---|---|---|
| REAL | 8/18/2022 | $100,000 | Wired to Truist |
| REAL | 9/14/2022 | $160,000 | Wired to Truist |
| REAL | 11/5/2022 | $700,000 | Wired to Truist |
| CORE | 11/5/2022 | $420,000 | Wired to Truist |
| REAL | 11/8/2022 | $90,000 | Wired to Truist |
| CORE | 12/2/2022 | $68,633 | Wired to Truist |
| REAL | 12/10/2022 | $60,000 | Wired to Truist |
| REAL | 12/22/2022 | $140,000 | Wired to Truist |
| REAL | 1/25/2023 | $20,000 | Wired to Truist |
| CORE | 8/9/2023 | $295,000 | Wired to Truist |
| REAL | 12/19/2023 | $100,000 | Wired to Truist |
| REAL | 2/21/2024 | $1,000,000 | Wired to Truist |
| REAL | 3/27/2024 | $85,000 | Wired to Truist |
| Total Principal | | $2,538,633 (excluding $700,000 rollover principal from Note #3) | |

80.     Throughout the timeline, Drive Planning executives assured Jim Eason that his investments were performing as promised.  For example, in or around August 2023, Class Plaintiff received a link through email to a Drive Planning video labeled a "REAL Opportunity Financial Update" in which Burkhalter and Bradford discussed the status of the REAL program.

81.     After viewing the Drive Planning video on or about August 2023, Jim Eason felt reassured that his investment was being used to fund real estate development projects as promised on which Drive Planning would earn a return that would ultimately benefit us as investors.

82.     In or around December 8, 2023, Bradford introduced Jim Eason to Joe Maniaci of Integrated Wealth Strategies ("IWS") for the purpose of creating a charitable LLC to minimize Jim Eason's future tax obligations on the interest received from the investments.

83.     Based on their recommendations, Jim Eason completed the process of establishing Eason Heritage LLC on December 8, 2023.  Bradford and IWS instructed Jim Eason to have all REAL notes re-titled into the Eason Heritage LLC name.   Jim Eason followed their recommendation and re-titled all but two REAL notes in the name of Eason Heritage LLC.

84.     At no time was Jim Eason told that his investment would or could be used by Drive Planning to make interest payments to other investors.  He was not told that his investment would or could be used by Drive Planning to pay back principal to other investors.

85.     Jim Eason was not told that his investment would or could be used by Drive Planning to fund the personal expenses of Drive Planning's principals, including Burkhalter and Bradford.

86.     Jim Eason was not told that certain of the properties paid for by Drive Planning using investor funds were not owned by Drive Planning.

87.     The net amount that Jim Eason currently has invested with Drive Planning in the REAL and CORE programs exceeds $2 million, not including the interest promised.

**B.     Christopher Eason and Heather Eason**

88.     Class Plaintiffs Christopher and Heather Eason are married and have small children.

89.     Christopher Eason is age 36 and the owner of Paragon Designer Services, LLC ("Paragon"), a Georgia limited liability company based in Alpharetta, Georgia, that provides support to interior designers.

90.    Heather Eason is a 38-year-old interior designer and is the owner of Heather Elizabeth Designs, LLC d/b/a Z&Co Design Group ("Z&Co"), a Georgia limited liability company based in Cumming, Georgia.

91.    In a phone call on or about July 19, 2021, Burkhalter first recommended Drive Planning's REAL program to the Easons.

92.    On the July 2021 phone call, Burkhalter told the Easons that the REAL program was a profit-sharing deal in which Drive Planning would provide capital for a developer to develop land.  The developer would then split the profit from sale after development, and returns would be distributed to investors. He later disclosed that the developer was a company called Embry.

93.    Burkhalter gave the Easons marketing materials making these representations.

94.    Burkhalter told the Easons that the return on the REAL investment was 10% of their  principal every 90 days, and that there was an option to roll over the principal and interest up to 3 times.  Based on Burkhalter's statements about REAL, including the guaranteed 10% rate of return, on or about July 29, 2021, the Easons invested $100,000 by wiring money directly from their bank account into a Drive Planning account at Truist Bank.  They also invested $20,000 by wiring money directly from Z&Co to Truist Bank.

95.    Drive Planning's wire instructions sheet instructed investors to include a comment in the wire instruction to include "Your Name/REAL."  The Easons included "REAL" in the comments for their wires to Truist Bank.

96.    The Easons withdrew their initial $100,000 investment in REAL roughly nine months later, on or about April 28, 2022, and in two separate wire transfers, received a total of $133,000 in principal and interest from Drive Planning's Truist Bank account.

97.     Reassured by the returns they received on their initial investment, the Easons individually and through their businesses subsequently invested in REAL again several times, including on November 18, 2022, for $20,000 through Z&Co.; on April 12, 2023, for $50,000 through Christopher Eason, individually; on April 14, 2023, for $100,000 through Z&Co.; on June 21, 2023, for $280,000 through Heather Eason, individually; on June 26, 2023, for $25,000 through Christopher Eason, individually; on January 4, 2024, for $20,000 through Paragon Designer Services; and on January 15, 2024, for $30,000 through Z&Co.  Each time, the Easons and their businesses wired their funds to Drive Planning's account at Truist Bank.

98.     Burkhalter told the Easons that their investment would be used by Drive Planning to invest in real estate, and that they were guaranteed a 10% return on their investment every 90 days.

99.     The net amount the Easons and their businesses currently have invested with Drive Planning in the REAL program is $545,000, not including the 10% return per quarter that was promised to them.

100.    At Bradford's recommendation, a portion of this total came from cashing out their Roth IRAs and children's 529 college savings plans.

101.    On August 22, 2023, Christopher Eason received a link through email to a Drive Planning video labeled a "REAL Opportunity Financial Update" in which Burkhalter and Bradford discussed the status of the REAL program.

102.    After viewing the Drive Planning video on or about August 2023, the Easons felt reassured that their investment was being used to fund real estate development projects on which Drive Planning would earn a return that would ultimately benefit us as investors.

103.    Class Plaintiffs were not told that their investment would or could be used by Drive Planning to make interest payments to other investors. Class Plaintiffs also were not told that their investment would or could be used by Drive Planning to pay back principal to other investors.

104.    Class Plaintiffs were not told that their investment would or could be used by Drive Planning to fund the personal expenses of Drive Planning's principals, including Burkhalter.

105.    Class Plaintiffs were not told that certain of the properties paid for by Drive Planning using investor funds were not owned by Drive Planning.

106.    Class Plaintiffs were not given any written risk disclosures relating to the REAL program.  They did not receive statements relating to their investment, other than the one-page form they received every three months that was used to withdraw or "roll over" their investment.

107.    Relating to the withdrawal of their initial investment plus interest from the REAL program in July 2021, Class Plaintiffs were never told that they would or could be paid interest out of other people's investments rather than Drive Planning profits from its business activities.

**6.    SEC Enforcement**

108.    On August 13, 2024, the SEC filed a civil complaint for injunctive and other relief in the Northern District of Georgia against Burkhalter and Drive Planning.  The SEC complaint charges that Burkhalter and Drive Planning ran a classic Ponzi scheme, paid existing investors with money garnered from new investors, and misappropriated tens millions of dollars.

109.    The SEC alleges the Drive Planning business model was a sham—instead of paying investor returns with payments obtained from legitimate bridge loans to property developers, Burkhalter and Drive Planning aggressively raised funds from new investors and used those incoming funds to pay old investor returns.

110.    The district court acted immediately on the SEC's emergency motions for a temporary restraining order and for the appointment of a receiver, granting the motions the same day they were filed on August 13, 2024.  The SEC court found "that the Commission has made a sufficient showing that, unless restrained and enjoined by order of this Court, Defendants and/or the Relief Defendants will dissipate, conceal, or transfer assets which could be the subject of an order directing disgorgement or the payment of civil money penalties in this action."

## CLASS ACTION ALLEGATIONS

111.    **Class Definition**.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed class of all persons who invested with Drive Planning and suffered damages.

112.    Excluded from the classes are Truist and its employees, the Relevant Non-Parties and their employees, as well as the Judge to whom the Action is assigned and any member of the Judge's staff and immediate family.

113.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1)-(4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

114.    **Numerosity**.  The members of the Class are so numerous that joinder of all members is impracticable.  More than 2,000 people invested money through Drive Planning.

115.    **Commonality**.  There are numerous questions of fact or law that are common to Plaintiffs and all the members of the Class.  Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to the following:

(a)      Whether Burkhalter and Drive Planning committed fraud;

(b)      Whether Truist had actual knowledge of the fraud and/or breaches of fiduciary duties;

(c)      Whether Truist knowingly participated in the fraud; and

(d)      Whether Class Plaintiffs and class members suffered damages.

116.   **Typicality**.   Plaintiffs have claims that are typical of the claims of all of the members of the Class.   Plaintiffs and each class member invested with Drive Planning and were subject to the wrongful conduct alleged in this complaint.   Furthermore, the claims arise under legal theories that apply to Plaintiffs and all other class members.

117.   **Adequacy of Representation**.   Plaintiffs will fairly and adequately represent the interests of the members of the Classes.   Plaintiffs do not have claims that are unique to Plaintiffs and not the other class members, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the claims of the Class.   Further, Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them.   There is no hostility between Plaintiffs and the unnamed class members.   Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

118.   **Predominance**.   Common questions of law and fact predominate over questions affecting only individual class members. The only individual issues likely to arise will be the amount of damages recovered by each class member, the calculation of which does not bar certification.

119.   **Superiority**.   A class action is superior to all other feasible alternatives for the resolution of this matter.   Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.   The damages sought by Plaintiffs and

class members are relatively small and unlikely to warrant individual lawsuits given the fees and costs, including expert costs, required to prosecute the claims.

120.   **Manageability**.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

121.   **Ascertainability**.  Class members are readily ascertainable.  The class members are identifiable from information and records in the possession, custody or control of Truist or the Relevant Non-Parties, as well as the appointed Receiver.

122.   All conditions precedent to this action have occurred or have been waived.

## COUNT I
### Knowing Participation in Fraud

123.   Plaintiffs re-allege and incorporate paragraphs 1 through 121 above as if fully set forth herein.

124.   As set forth above, Burkhalter and Drive Planning perpetrated a fraud upon Plaintiffs and class members through materially false and misleading statements and omissions that misled Plaintiffs and class members to believe they were investing in a legitimate investment. Burkhalter and Drive Planning knew these statements to be false.   Among other fraudulent conduct, Burkhalter and Drive Planning:

    a.    falsely told inventors that their investments would be used to fund bridge loans to property developers or joint ventures with developers;

    b.    falsely promised high returns on their investments every three months;

    c.    falsely promised that the investments were secured by real estate;

d.   concealed from investors that they were operating a Ponzi scheme by, among other unlawful acts, paying earlier investors with funds obtained from later investors; and

e.   concealed from investors that they misappropriated and misused millions of investor funds for improper purposes.

125.   Plaintiffs and class members reasonably relied to their detriment upon those misrepresentations when they invested with Burkhalter and Drive Planning and/or rolled over their investments.

126.   Truist knowingly participated in the fraud, with knowledge that Burkhalter and Drive Planning were defrauding consumers like Class Plaintiffs and class members.  In connection with its knowing participation and substantial and material assistance to Burkhalter and Drive Planning, Truist knew of its role in their scheme, and acted knowingly in participating.

127.   Truist substantially benefited from its participation in the scheme, earning substantial fees from Drive Planning's accounts.

128.   As a direct and proximate result of Truist aiding and abetting the fraud, Plaintiffs and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Truist for their damages; pre- and post-judgment interest; punitive damages; and such other and further relief as the Court deems just and proper.

## COUNT II
### Unjust Enrichment

129.   Plaintiffs re-allege and incorporate paragraphs 1 through 121 above as if fully set forth herein.

130.   Truist provided banking services to Drive Planning through various bank accounts.  Those bank accounts were used to carry out the Ponzi scheme.

131.    The funds held in the Drive Planning accounts belonged to investors.  Thus, Plaintiffs and class members conferred benefits upon Truist in the form of deposits from which Truist generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees.  Truist knowingly and voluntarily accepted, and retained, the deposits and those benefits.

132.    Because Truist aided and abetted Burkhalter and Drive Planning's fraud and breach of fiduciary duty, it would be inequitable for Truist to retain the benefits it generated from monies of Class Plaintiffs and class members.

133.    Plaintiffs do not have an adequate remedy at law.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Truist for the return of income and fees retained by Truist; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

### COUNT III
**Negligence**

134.    Plaintiffs re-allege and incorporate paragraphs 1 through 121 above as if fully set forth herein.

135.    A fiduciary relationship existed between Burkhalter and Drive Planning on the one hand and investors like Plaintiffs and class members on the other hand.

136.    Truist knew or should have known of this fiduciary relationship.

137.    Truist had actual knowledge that its accountholder, Drive Planning, was misappropriating Plaintiffs' and class members' funds.

138.    Truist therefore had a duty of care to Plaintiffs and class members.

139.     Truist breached that duty of care by continuing to allow Drive Planning to conduct banking services with the bank and failing to close its accounts.

140.     Because of and as a result of that breach, Plaintiffs and class members suffered damages.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated class members, respectfully demand judgment against Truist for their damages, including but not limited to profits made by Truist relating to Burkhalter and Drive Planning, their principals or employees; pre- and post-judgment interest; and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated:  September 16, 2024                    Respectfully submitted,

**THE DOSS FIRM LLC**
1827 Powers Ferry Road Southeast, Suite 100
Atlanta, Georgia 30339
Telephone: (770) 578-1314
Facsimile: (770) 578-1302


By: /s/ *Jason R. Doss*
Jason R. Doss
Georgia Bar No. 227117
Primary email: jasondoss@dossfirm.com

**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
Miami Tower
100 Southeast Second Street, 36th Floor
Miami, Florida  33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789


By: /s/*Jason Kellogg*
    Jeffrey C. Schneider, P.A.
    (*pro hac vice forthcoming*)
    Primary email: jcs@lklsg.com
    Secondary email: ph@lklsg.com
    Jason K. Kellogg, P.A.
    (*pro hac vice forthcoming*)
    Primary email: jk@lklsg.com
    Secondary email: ame@lklsg.com
    Victoria J. Wilson
    (*pro hac vice forthcoming*)
    Primary email: vjw@lklsg.com

Secondary email: ph@lklsg.com
Peter J. Sitaras
(*pro hac vice forthcoming*)
Primary email: pjs@lklsg.com
Secondary email: ph@lklsg.com